## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

**BLX GROUP, INC.**,

                Debtor.

Case No.  **09-61893-11**

## *MEMORANDUM of DECISION*

At Butte in said District this 20th day of October, 2009.

In this Chapter 11 bankruptcy, on shortened notice, a hearing was held October 2, 8 and 9, 2009, in Butte on: (1) the Emergency Motion for Appointment of Trustee filed September 22, 2009, at docket entry no. 6, by petitioning creditor Marc S. Kirschner, as Trustee of the Yellowstone Club Liquidating Trust ("YCLT"), together with the responses thereto filed by CIP Yellowstone Lending LLC ("CIP") on September 29, 2009, and Palm Desert National Bank on September 30, 2009; (2) CIP's Emergency Motion to Modify Automatic Stay, pursuant to 11 U.S.C. §§ 362(d)(1) and (2), Fed. R. Bankr. P. 4001 and 9014, and Mont. LBR 4001-1 to Foreclose on Collateral filed September 25, 2009, at docket entry no. 16, together with the objections thereto filed by YCLT, Palm Desert National Bank, Stephan Baden, Jon Peddie and Timothy L. Blixseth ("Blixseth"); (3) Blixseth's Expedited Motion to Dismiss Involuntary Petition for Lack of Subject Matter Jurisdiction or, alternatively, to Transfer Venue to Central District of California filed September 30, 2009, at docket entry no. 51, together with YCLT's objection thereto; (4) the Emergency Motion of Yellowstone Club Liquidating Trust for Leave to File Adversary Proceeding filed October 5, 2009, at docket entry no. 94, together with CIP's

1

objection thereto; and (5) YCLT's Emergency Motion for Rule 2004 Examinations filed

September 29, 2009, together with CIP's objection thereto.  YCLT and its Trustee, Marc S.

Kirschner, were represented at the hearing by attorney Shane P. Coleman of Billings, Montana;

CIP was represented at the hearing by Paul D. Moore, Barry D. Green, and Kevin J. Renna of

Boston, Massachusetts, Michael R. Lastowski of Wilmington, Delaware and Benjamin P. Hursh

of Missoula, Montana; Palm Desert National Bank was represented by David J. Dietrich of

Billings, Montana; Blixseth was represented by Philip H. Stillman of Olivenhain, California and

Daniel D. Manson of Butte, Montana; and Mark E. Noennig of Billings, Montana appeared on

behalf of First Bank.  Richard J. Samson, Samuel Byrne, Steven Smith, Karen Moller, Debbie

Duneman, Raymond Dozier, Marc S. Kirschner and Chris Charnas testified.  YCLT's Exhibits 1

through 13, YCLT's Exhibits 16-21, CIP's Exhibits A, B, C, D, G, I, J, K, L and M, and

Blixseth's Exhibit 100 were admitted into evidence.

　　　　In a separate Memorandum of Decision and Order entered October 15, 2009, this Court

memorialized its oral ruling made October 9, 2009, denying Blixseth's Motion to Dismiss.  In

addition, the parties represented to the Court that YCLT's Emergency Motion for Rule 2004

Examinations was resolved.  Indeed, such Motion is presumably now moot because the time

frame to produce the documents has expired and CIP has either produced or not produced the

requested documents.  This Memorandum of Decision sets forth the Court's findings of fact and

conclusions of law with respect to the other matters heard October 2nd, 8th and 9th.

## BACKGROUND

　　　　The Court's Memorandum of Decision and Order of October 15, 2009, sets forth the

historical background of this Debtor, and its connection to other Debtors who have sought

protection under the Bankruptcy Code in this District.  Much of the background set forth in the
Court's prior Memorandum of Decision and Order is again set forth in this Memorandum of
Decision.

Blixseth and his former wife, Edra Blixseth ("Edra"), acquired land in Montana through
various transactions, and through Yellowstone Mountain Club, LLC, Yellowstone Development,
LLC, Yellowstone Club Construction Company, LLC and Big Sky Ridge, LLC (collectively the
"Yellowstone Club entities"), began development in the late 1990s of the world's only private ski
and golf community, commonly referred to as the Yellowstone Club.  The Yellowstone Club is a
membership only master-planned development, situated on 13,500 acres of private land in
Madison County, Montana near Big Sky, Montana.

Until mid-August of 2008, the Yellowstone Club entities were controlled by Blixseth in
his capacity as the sole shareholder of his holding company, Blixseth Group, Inc. ("BGI"), which
was the sole Class A shareholder that owned approximately 87% of the outstanding stock in
Yellowstone Mountain Club, LLC and Yellowstone Development, LLC, and presumably owned
all the stock in Big Sky Ridge, LLC.[1]  Prior proceedings suggest that the Yellowstone Club
Construction Company, LLC was owned by Yellowstone Development, LLC.

Blixseth served as President and CEO of BGI, an Oregon sub-S corporation, from 1999 to
mid-August of 2008.  The Yellowstone Club entities, while under the control of BGI, and thus
Blixseth, entered into a Credit Agreement with Credit Suisse, Cayman Islands Branch, dated
September 30, 2005.  The Credit Agreement provided the Yellowstone Club entities with a $375

---

[1]  Yellowstone Mountain Club, LLC and Yellowstone Development, LLC have two
classes of members; Class A members, who have voting rights, and Class B non-voting members

million Senior First Lien Credit Facility, which was funded in its entirety on September 30, 2005. In accordance with the Credit Agreement and upon closing the loan, $342,110,262.53 was wired to the Yellowstone Club entities on September 30, 2005. This amount reflected the total loan amount of $375 million less fees, administrative costs, and a $24,241,910.98 takeout to payoff preexisting debt. On the same date that Credit Suisse transferred $342,110,262.53 to the Yellowstone Club entities, Blixseth transferred approximately $209 million out of the Yellowstone Club entities to BGI.

   The immediate transfer of funds out of the Yellowstone Club entities to BGI and then to Blixseth was not memorialized in any contemporaneous loan documents but was simply reflected on the Yellowstone Club entities' books with a journal entry. When the Class B shareholders started threatening suit against Blixseth and the Yellowstone Club entities regarding the $375 million Credit Suisse loan, Blixseth had a two-page promissory note in the amount of $209 million drafted. The $209 million unsecured demand note, payable by BGI to the Yellowstone Club entities, was created in May of 2006, and backdated to September 30, 2005.

   Roughly all of the $209 million proceeds that were transferred from the Yellowstone Club entities to BGI were then disbursed by Blixseth to various personal accounts and payoffs benefitting Blixseth and Edra personally. Blixseth and Edra separated sometime in 2006 and Blixseth retained sole control of BGI and the Yellowstone Club entities until August of 2008, when Edra was awarded BGI and the Yellowstone Club entities as part of a marital settlement agreement. Edra, on August 19, 2008, changed the name of BGI to BLX Group, Inc. ("BLX").

   As contemplated by the marital settlement agreement, and to obtain control of BGI and the Yellowstone Club entities, Edra was required to make various payments. Edra was

4

eventually successful in securing a $35 million loan from CIP ("CIP Loan"). The CIP Loan was evidenced by two notes:

> 1. A Promissory Note in the principal sum of $13,000,000.00 dated August 13, 2008, made by BLX and Edra to CIP, Exhibit A; and

> 2. A Promissory Note in the principal sum of $22,000,000.00 made by BLX and Edra to CIP. Exhibit B.

The CIP Loan was secured in part by a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing granted by BGI for the benefit of CIP. Exhibit C. The BGI Deed of Trust encumbers property owned by BGI commonly known as 42765 Dunes View Road, Rancho Mirage, California (the "Porcupine Creek Property"), as well as two single family houses (and associated personal property) located outside of the gates of the Porcupine Creek Property commonly known as 71361 Gardess Road and 71621 Gardess Road, Rancho Mirage, California. The CIP Loan is also secured by real property commonly referred to as the 160-acre Blixseth Family compound, which includes two residences, located within the Yellowstone Club boundaries.

Of the $35 million CIP Loan, CIP retained $13,094,973.33 to payoff a loan that Blixseth and Kawish, LLC owed to CIP. CIP also retained $225,000 for closing costs and $28,000.00 for pre-closing interest. In addition, cash was paid out as follows:

| | |
|---|---|
| Title Insurance Premium/Costs | $102,012.80 |
| LeMond Title Insurance Premium/Costs | $13,540.00 |
| Owner's Policy Title Insurance Premium/Cost | $7,834.00 |
| LeMond Payment (wired directly to LeMond) | $8,000,000.00 |
| California Property Tax | $624,763.00 |
| Tim Blixseth Payment (wired directly to Blixseth) | $4,944,396.17 |
| Archer Financing Fee (wired directly to Archer Capital) | $200,000.00 |
| Borrower Proceeds | $1,016,477.28 |
| Commerce Escrow Fee | $18,000.00 |

| | |
|---|---|
| Federal Tax Lien | $2,176,779.22 |
| Borrower Counsel Fee | $500,000.00 |

The CIP Loan was part of a larger transaction that was meant to bring financial stability to the Yellowstone Club.  The CIP Loan was intended to be a short-term bridge loan that would provide Edra time to secure longer-term financing.  The CIP Loan became due and payable in full on September 30, 2008.

Just months after Edra assumed control of the Yellowstone Club, Edra caused Yellowstone Mountain Club, LLC, Yellowstone Development, LLC, Yellowstone Club Construction Company, LLC and Big Sky Ridge, LLC to seek protection under Chapter 11 of the Bankruptcy Code on November 10, 2008.  The Yellowstone Club entities' Third Amended Joint Plan of Reorganization was confirmed by this Court on June 2, 2009.  YCLT, by virtue of the Yellowstone Club entities' confirmed Third Amended Joint Plan of Reorganization, is the successor-in-interest to numerous of the Yellowstone Club entities' claims, including the claim against BLX stemming from the $209 million unsecured demand note.

Edra filed for personal protection under Chapter 11 of the Bankruptcy Code on March 26, 2009.  This Court converted Edra's Chapter 11 bankruptcy to Chapter 7 of the Bankruptcy Code on May 29, 2009, and Richard J. Samson of Missoula, Montana was appointed as the Chapter 7 Trustee.  On October 6, 2009, this Court entered an Order permitting Western Capital Partners to pursue its nonbankruptcy remedies with respect to Edra's stock in BLX.

BLX and Edra have not repaid the CIP Loan.  In addition, even though BLX and Edra are required to maintain insurance on CIP's collateral, neither BLX nor Edra have complied with such requirement since January of 2009.  Because CIP has not received any payment on the CIP

6

Loan since September 30, 2008, and because BLX and Edra are not maintaining insurance on the property, CIP caused a Notice of Default and Election to Sell Under Deed of Trust to be filed in the Official Records of Riverside County, California on January 7, 2009.  A foreclosure sale of the BLX property was scheduled to occur on September 23, 2009.  This involuntary proceeding was filed on September 21, 2009.  Blixseth filed a separate involuntary proceeding against BLX in the United States Bankruptcy Court for the Central District of California on September 22, 2009.  As a result of the pending involuntary cases against BLX, CIP has continued the scheduled sale of the BLX property to October 23, 2009.

Richard J. Samson ("Samson"), the Chapter 7 Trustee in Edra's bankruptcy, testified that since his appointment as Chapter 7 Trustee, Porcupine Creek has not generated any income and Edra's bankruptcy estate has not expended any funds to maintain Porcupine Creek.  When questioned about the cost of maintaining Porcupine Creek on a limited basis, Samson testified that he thought the expenses were probably $150,000 per month, but Samson had no personal knowledge of such expenses.  Moreover, Samson testified that he does not have the financial ability to cover any expenses associated with Porcupine Creek and in fact, could not afford to have the property appraised.  Samson explained that he took steps to stop CIP's foreclosure sale but eventually concluded that there was not enough equity in the property to reach Edra's bankruptcy estate.  Samson explained that he was aware of roughly $70 million of liens that were filed against the Porcupine Creek property.

Starting in January of 2009, CIP began making protective advance payments to protect Porcupine Creek from further deterioration.  The evidence shows that CIP has paid approximately $1,742,638.90 to cover necessary expenses at Porcupine Creek such as insurance,

7

utilities, maintenance and upkeep of the 19-hole private PGA golf course, security, etc.  Samuel Byrne ("Byrne") explained that the protective advances of roughly $200,000 per month understates the actual cost of maintaining the property because of how and when property taxes and utility payments are paid.

Byrne testified that CIP might consider making additional protective advances on the Porcupine Creek property.  However, that offer is off the table unless CIP receives assurance that its liens will not be challenged.  According to Byrne, YCLT is seeking to avoid CIP's $35 million loan as a fraudulent transfer.

Consistent with Byrne's testimony, Marc S. Kirschner ("Kirschner") of New York, New York, the Trustee of YCLT, testified that he believes that BGI was insolvent, or was rendered insolvent by the $35 million CIP Loan and that BGI received little if any benefit from the loan.  This is the very nature of YCLT's pending Motion for Leave to File Adversary Proceeding.  Kirschner testified that he met with Byrne shortly after being appointed the Trustee of YCLT in July of 2009 and talked about a consensual plan to hire a professional marketing firm.  Kirschner also asked that CIP continue providing preservation expenses for Porcupine Creek.  However, as mentioned earlier, CIP refuses to provide preservation expenses unless YCLT provides assurances that it will not pursue any fraudulent conveyance claim against CIP.

With respect to the pending Motion for Leave to File Adversary Proceeding, Kirschner testified that YCLT seeks permission to file its complaint against CIP and as soon as a Chapter 11 trustee is appointed in this proceeding, YCLT will tender litigation of the adversary proceeding to the Chapter 11 trustee.  Along such lines, Kirschner has also talked extensively with Chris Charnas, a commercial real estate broker with of Link Capital Advisors.  Kirschner

8

believes that Chris Charnas is uniquely qualified to market property such Porcupine Creek. Finally, Kirschner testified that he has talked to a lender who is willing to provide the Debtor with $5 million of debtor-in-possession financing on a priming basis.

### Steven R. Smith Appraisal – Exhibit G.

Smith has been an appraiser since 1976 and YCLT stipulated that Smith is a qualified expert appraiser. Smith specializes in appraising luxury homes in Southern California, but Smith has never appraised a golf course. Smith was hired by CIP to perform an appraisal of the Porcupine Creek property and the Gardess Road homes. Smith has personally visited the subject properties on numerous occasions. Smith explained that the Porcupine Creek property, together with the two homes located on Gardess Road, is 264.77 acres. On that acreage is a 18,380 sq. ft. estate residence with four guest suites (casitas), four additional guest houses, 2 service houses and a 19 hole private PGA golf course.

Smith used the sales comparison, income and cost approach in arriving at initial valuation conclusions of $40,750,000, $24,172,000 and $54,800,000, respectively. In his sales comparison approach, Smith purportedly considered "all the listings and sales of homes in the low desert that were over 7,000 square feet." Smith's appraisal also recites that there "were 15 newer homes that were used for observations, including sales and listings." Smith then provides a listing count on page 57, Exhibit G, of 26 properties ranging in size from 3,662 sq ft to 22,597 sq ft. It is not clear whether all 26 properties on page 57 were considered by Smith as Smith's appraisal does not show any upward or downward adjustments that this Court generally sees in a sales comparison approach analysis. Smith testified that he did a search of the Desert Area Multiple Listing "for the largest, highest-priced houses" that sold in the Coachella Valley and the raw data

9

results of that search are listed on page 57 of Exhibit G. Smith concedes that he made no upward or downward adjustments to the raw data. Smith also concedes that he did not look at comparable sales for open space or golf courses.

While Smith ultimately relied on the sales comparison approach to reach his estimate of value, Smith also considered the cost approach. Smith's testimony with respect to how he arrived at his cost approach valuation sheds light on the overall depth and detail of Smith's appraisal:

Q.     Okay. Once you -- under the cost approach, though, once you determine the value of the land as if it were vacant, the next thing you do is determine the cost that it would take to construct improvements, correct?

A.     Yes.

Q.     Where do you get cost values from?

A.     For me, from years of appraising houses that are being constructed or are newly built, proposed construction.

Q.     Let's take these one at a time. In particular, with respect to the estate residence, the main residence, where did you get your cost of construction number for this item?

A.     That was my estimate, based upon the scale of the house in terms of its square footage, its cubic footage; and the materials used on the construction of the house and the finish of the house.

Q.     Is that based on comparable sales?

A.     No, that's upon my experience.

Q.     Okay. How about the -- so there's no book that you consulted that can tell us what it would cost to create this today?

A.     There's no book for houses -- there's no cost book for houses like this.

Q.     How about for the golf course itself? Is there a reference that you consulted to determine how much it would cost to add the improvement of the golf course?

10

A.      The numbers that I used in estimating the golf course, the specimen trees, the stone wall, came mostly from my conversations with the greenskeeper who built them.

Q.      Okay. And you used his cost numbers?

A.      Yes -- well, no, because our discussion was, "If you did it today, what would it cost?" not what it cost at the time.

Q.      So the only person you consulted with in that regard was the greenskeeper out at the Porcupine Creek golf course?

A.      Yes.

Q.      How about with respect to the flood abatement infrastructure? Who did you consult to determine what the value of that would be?

A.      I was not aware that the flood abatement infrastructure was part of this property.

Q.      You didn't even know it was part of this project?

A.      No. As far as I could tell, it's totally separate.

Q.      How about the roads, the interior to the property? How did you go about deciding what it would cost to add those improvements under the cost approach?

A.      That's not included.

Q.      How about the roads outside of the golf course but within -- but owned by BGI, outside the exterior gates, for example?

A.      Could you ask that question again?

Q.      Yeah -- well, let me ask it differently: Other than the golf course - with whom you spoke to the golf course superintendent to get the cost value of that - what else did you value under the cost approach in terms of the value to add that now to the vacant land number that you came up with?

A.      Well, everything I considered is here.

Q.      So if there's no cost data in your report to show how you got it, it doesn't exist?

A.      No, I didn't say that.

11

Q.      Okay.

A.      I said everything I considered is here.

Q.      Is in here.

A.      Yes.

Q.      Okay. Where can I go in there and find the amount of -- that it would take right now under the cost approach to create the fountains, for example?

A.      It's in the lakes and streams.

Q.      Okay. And where did you get that information to put in there?

A.      From the guy that built them.

Q.      The golf course superintendent?

A.      Yeah.

As noted above, Smith determined that the sales comparison approach was the most relevant.  Smith broke his appraisal into "zones of value" and assigned the following values to the identified zones:

| | | | | | |
|---|---|---|---|---|---|
| Estate Residence, 4 acres and Site Imps. | 18,380 | X | $1,000 | = | $18,380,000 |
| Guest Suites @ 637, 591, 607, 644 | 2,479 | X | $250 | = | $619,750 |
| 4 Guest Houses @ 1,851 | 7,404 | X | $300 | = | $2,221,200 |
| 2 Single Family Homes | | | | | |
| | 1,685 | X | $90 | = | $151,650 |
| | 1,867 | X | $90 | = | $168,030 |
| Golf Course, ProShop, Lakes and Streams, Merry-go-round, Specimen Trees, Stone Walls | 19 | X | $800,000 | = | $15,200,000 |
| Mountain Reserve Land | 57 | X | $8,000 | = | $456,000 |
| | | | Total Value | | $40,756,630 |

12

Smith then discounted the foregoing value to conclude that the subject properties had a quick sale value of $32,600,000 as of December 30, 2009.  Smith states in his appraisal that it "was a difficult assignment," and that the "property is like none other that we have appraised or reviewed appraisals on a property with this much land, amenities or structures, let-alone a golf course."

### Raymond L. Dozier Appraisals – Exhibit 9.

Like Smith, Dozier was hired to perform an appraisal of the Porcupine Creek property and the two Gardess Road homes.  Dozier generally appraises commercial property, subdivisions and master-planned communities, but Dozier appraises all types of complex properties.  For example, Dozier has appraised over thirty golf courses.  Dozier has appraised the subject property three or four times and personally inspected the property in September of 2009.  Dozier describes the subject property as an opulent "[g]ated, private, 230± acre estate with a luxury estate home, [signature] golf course, four guest houses, extensive amenities and extensive landscape."  CIP stipulated that Dozier is a qualified expert appraiser.

In his appraisal, Dozier concludes that the subject property has an unimpaired "as is" market value of $108,500,000.  Dozier placed the greatest emphasis on the cost approach, which Dozier explains was closely supported by the comparable sales approach.  As for the cost approach, Dozier testified that he starts by valuing the property as vacant real estate and then costs out the improvements, less depreciation, including physical deterioration, functional inadequacies or super-adequacies and economic or external obsolescence.

To support his cost approach, Dozier then looked at the sales comparison approach. Dozier explained that an appraiser should always go from the known to the unknown, and should

13

end up with valuations that are fairly close and reconcilable.  In order to apply both the cost approach and the sales comparison approach, Dozier, like Smith, broke the subject property into zones of value.  Dozier did not use the income approach because Dozier determined that properties, such as the subject property, are not normally purchased for income purposes.

With respect to the cost approach, Dozier first sought to value BGI's land as if it were vacant.  Dozier considered four estate land sales and four single family residence lot sales.  The first estate land sale closed on February 1, 2008, and involved the sale of a 1.45 parcel of vacant land for $2,250,000.  The second estate land sale involved a 1.005 acre of vacant land that sold for $1,970,000 on January 1, 2008.  The third estate land sale closed on June 21, 2007, and involved a 1.24 acre parcel of vacant land.  Dozier notes that the market was declining in 2007 and 2008, and thus Dozier made adjustments for market conditions to all three of the above properties.  The fourth estate land comparable involves a current listing where the seller is asking $3,700,000 for a 4.010 acre parcel of land.

Next, Dozier looked at two single family residence lots (with no building improvements) that sold in 2007 and 2008 for $126,000 and $350,000 respectively.  Dozier also considered one sale of a $1,750 sq. ft home that sold on June 27, 2008, for $343,000.  Dozier then looked at three open space land sales, one current listing of open space land, and four mountain land sales. The open space land, ranging in size from 5.04 acres to 87.66 acres, sold at a price of $228,175 to $367,063 per acre between December 26, 2006, and April 2, 2008.  The current open space land listing involves an 11 acre parcel of land for which the seller is asking $3,665,000, or $333.182 per acre.  The mountain land sales, of parcels ranging in size from 27.20 acres to 911.39 acres, occurred between May 4, 2007, and August 8, 2008.  The price per acre for the

14

mountain land sales ranged from $918.01 per acre to $3,018.87 per acre.

After identifying the 16 comparable properties, Dozier prepared adjustment grids which compare the characteristics of the various properties to the subject properties. Dozier then made adjustments for location, access, view, topography/shape, shape, zoning, highest and best use, site size/square feet.

Dozier concluded that the "as if vacant" market value of all BGI's land was $48,084,000. Dozier then proceeded to the second step of his cost approach analysis, which requires the calculation of the cost to replace the improvements on BGI's property, less any accrued depreciation. Dozier consulted the Marshall Valuation Service Luxury Home Cost Book to estimate the cost to replace the estate residence. Dozier also consulted the Marshall Valuation Service High Value Residence when he estimated the cost to replace the casitas and guest homes. Similarly, Dozier consulted the commercial Marshall Valuation Service with respect to the landscaping, hardscaping and other similar improvements. Dozier concluded that the cost to replace the improvements on BGI's property would be $60,684,043 less $570,000 of functional depreciation.

Dozier continued his appraisal by looking at the sales comparison approach to value. Dozier first considered four estate sales (improved). The improved estate sales involved property that sold between April 2, 2008, and January 13, 2009, at a price of $6,950,000 to $9,000,000. Finally, Dozier examined three sales of improved single family properties and one current listing. The single family homes all sold in 2008 at a price of $330,000 to $350,000. The current listing is for a property in Rancho Mirage that is listed for $365,000. As with the land sales, Dozier prepared a grid wherein he compared the physical characteristics of the property and then made

15

adjustments for such things as view, design and appeal, quality, age, etc.

After doing a cost approach and sales comparison approach, Dozier prepared the

following summary regarding his fair market valuation of $108,500,000:

**Land**

| | | | |
|---|---|---|---|
| Primary Estate Land | 8 Acres | $5,499,000 | ($687,375 per Acre) |
| Estate Reserve Land | 4 Acres | 2,968,000 | ($742,000 per Acre) |
| Estate Guest House Land | 4 Acres | 2,968,000 | ($742,000 per Acre) |
| Open Space Land | 157 Acres | 35,995,000 | ($229,268 per Acre) |
| Mountain Reserve Land | 57 Acres | 474,000 | ($8,316 per Acre) |
| SFR Lots | 2 Lots | 180,000 | ($90,000 per Lot) |
| **Subtotal All Land Allocation** | **230.37 Acres** | **$48,084,000** | **($208,725 per Acre)** |

**Improvements**

| | | | |
|---|---|---|---|
| Estate Residence, Casitas & Amenities | 18,430 Sqft | 20,150,000 | ($1,093 per Sqft) |
| Guest Houses | 7,444 Sqft | 1,888,000 | ($253.63 per Sqft) |
| Two Single Family Residences | 2,665 Sqft | 184,000 | ($69.04 per Sqft) |
| Golf Course | 19 Holes | 14,934,000 | ($786,000 per Hole) |
| Golf Clubhouse (pro shop/conference) | 3,168 Sqft | 269,000 | ($84.91 per Sqft) |
| Lakes/Reservoirs/Wells/Pumps | 174,240 Sqft | 1,295,000 | ($7.43 per Sqft) |
| Children's Carrousel Park | 15,000 Sqft | 147,000 | ($9.80 per Sqft) |
| Outdoor Entertainment Center | 18,000 Sqft | 207,000 | ($11.50 per Sqft) |
| Landscape-Hardscape-Water Treatment-Fountains | 137 Acres | 20,816,000 | ($151,942 per Acre) |
| Storage Yard Improvements | 20 Acres | 45,000 | ($2,250 per Acre) |
| Perimeter Fence & Entry Gates | 9,600 Lf | 109,000 | ($11.35 per Foot) |
| **Subtotal Land, Improvements & Amenities** | | **$60,044,000** | |

16

**Furnishings, Fixtures & Equipment**

| | | | |
|---|---|---|---|
| Golf Course Equipment | 19 Holes | $387,000 | ($20,368 per Hole) |
| **Subtotal F F & E** | | **$108,515,000** | |
| **Total R/O** | | **$108,500,000** | |

Dozier then discounted the above value to obtain an impaired "as is" market value of $73,500,000 as of September 14, 2009.[2]  The impaired "as is" market value includes a downward adjustment for a Class IV detrimental condition impact stemming from this bankruptcy.

In prior appraisals, Dozier had appraised the subject property at roughly $195,000,000 in October of 2007 and $128,000,000 in January of 2009.  Dozier explained that developers in the Coachella Valley were historically challenged by environmental groups that opposed development.  However, in January of 2009, various towns in the Coachella Valley and the environmental groups agreed to a multi-species plan that is depicted in what Dozier referred to as a multi-species overlay.  Porcupine Creek is outside the multi-species overlay.  Thus, Dozier testified that the highest and best use of Porcupine Creek, which has historically been limited to open space with 18 acres limited to one dwelling unit per acre, can now be changed.  Dozier stated that the value of Porcupine Creek was highly enhanced by the multi-species plan.

## APPLICABLE LAW and DISCUSSION

### 1.  CIP's Emergency Motion to Modify Automatic Stay.

The commencement of a case under the Bankruptcy Code generally stays any and all

---

[2]  Dozier states in his appraisal that during his September 14, 2009, inspection of the property that "permanent specimen trees and landscaping were being taken care of in a similar manner observed in my October 17, 2007 [inspection].  However, seasonal landscaping and water feature amenities, i.e. seasonal flowers, regular maintenance of water features and pools, were the focus of the current deferred maintenance.  In other words, nonessential maintenance items that could be regenerated in a reasonably short period of time were being neglected."

17

proceedings against debtors.  11 U.S.C. § 362(a); *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990).  The importance of the automatic stay is discussed in the legislative history of § 362:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors.  It stops all collection efforts, all harassment, and all foreclosure actions.  It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 340-42 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 54-55 (1978); *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787 at 5840-41 and 6296-97.

The fundamental debtor protections afforded by § 362(a), however, are not absolute.  11 U.S.C. 362(d).  As explained in § 362(d):

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [and]
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section if–
> > (A) the debtor does not have an equity in such property; and
> > (B) such property is not necessary for an effective reorganization[.]

Except for the issue of a debtor's equity in property, in a proceeding on a motion to modify the automatic stay, the debtor has the burden of proof to show that the stay should not be modified or annulled.  *In re National Envtl. Waste Corp.*, 191 B.R. 832, 836 (Bankr. C.D.Cal. 1996), *aff'd*, 129 F.3d 1052 (9th Cir. 1997); *In re Syed*, 238 B.R. 126, 132 (Bankr. N.D.Ill. 1999); *In re Sauk*

*Steel Co., Inc.*, 133 B.R. 431, 436 (Bankr. N.D.Ill. 1991); 11 U.S.C. § 362(g).

As noted above, § 362(d)(1) allows a court to grant relief from the automatic stay for cause, "including the lack of adequate protection." What constitutes adequate protection for purposes of § 362(d)(1) is not defined in the Bankruptcy Code. However, "11 U.S.C. § 361 sets forth three non-exclusive examples of what may constitute adequate protection: 1) periodic cash payments equivalent to decrease in value, 2) an additional or replacement lien on other property, or 3) other relief that provides the indubitable equivalent." *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 (9th Cir. 1984). This Court discussed the concept of adequate protection in *In re WRB West Associates Joint Venture*, 106 B.R. 215, 219-20 (Bankr. D.Mont. 1989):

> In a classic sense, adequate protection payments should be applied to compensate a secured creditor for any diminution in the value of collateral as a result of use, depreciation, destruction or other caused reduction in value. 11 U.S.C. § 361; 11 U.S.C. § 363(e); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1412 n. 57 (5th Cir.1986) (collecting supporting cases), *aff'd, United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, [484] U.S. [365], 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *General Elec. Mortgage Corp. v. South Village, Inc. (In re South Village, Inc.)*, 25 B.R. 987, 994 (Bkrtcy.D.Utah 1982) ('adequate protection was protection ... against depreciation of the collateral when it erodes the allowed secured claim.')."

[*Matter of Kain*,86 B.R. 506, 511, 513 (Bankr. W.D. Mich. 1988)]

On the issue of adequate protection required by § 363(d) and (e), *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987) holds:

> "In recognition of the powers created in bankruptcy law to adjust debts and creditors' interest, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. *See 2 Collier on Bankruptcy* ¶ 361.01[1] (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor

19

bargained prebankruptcy. House Rep. No. 95-595, 95 Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. *In re Martin*, 761 F.2d 472 (8th Cir.1985); *In re Monroe Park*, 17 B.R. 934 (D.C.Del.1982). Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. *In re Martin*, 761 F.2d at 472; *In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984); *In re Bank Hapoalim B.M., Chicago Branch v. E.L.I.*, Ltd., 42 B.R. 376 (D.C.N.D.Ill.1984); *Brookfield Production Credit Association v. Borron*, 36 B.R. 445 (D.C.E.D.Mo.1983), *aff'd*, 738 F.2d 951 (8th Cir.1984)."

In *Mellor* the Ninth Circuit Court of Appeals recognized that an "equity cushion", while not specifically mentioned in the Bankruptcy Code, is a common form of adequate protection:

[I]t is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court. *In re Curtis*, 9 B.R. at 112. In fact, it has been held that the existence of an equity cushion, standing alone, can provide adequate protection. *In re San Clemente Estates*, 5 B.R. 605, 610 (B.Ct.S.D.Cal.1980); *In re Tucker*, 5 B.R. 180, 182 (B.Ct.S.D.N.Y.1980); 2 COLLIER ON BANKRUPTCY, § 361.02[3] at 361-9; (15th ed. 1979). A sufficient equity cushion has been found to exist although not a single mortgage payment had been made. *In re Curtis*, 9 B.R. at 111.

*Id.  See also In re Interstate Distrib. Co., Inc.*, 13 Mont. B.R. 86, 89-90 (D. Mont. 1993) (Recognizing that an equity cushion is the classic form of protection for a secured debt, and its existence, standing alone, can provide adequate protection under the Bankruptcy Code.)  The *Mellor* Court defined the term "equity cushion" as "the value in the property, above the  amount owed to the creditor with a secured claim, that will shield that interest from loss due to any decrease in the value of the property during time the automatic stay remains in effect."  *Id.* at 1400 n.2.

Section 362 vests this Court with wide latitude in granting appropriate relief from the

20

automatic stay, and a decision to lift the automatic stay is within a bankruptcy court's discretion, and subject to review for an abuse of discretion. *In re Delaney-Morin*, 304 B.R. 365, 369-70 (9th Cir. BAP 2003); *In re Leisure Corp.*, 234 B.R. 916, 920 (9th Cir. BAP 1999); *In re Plummer*, 20 Mont. B.R. 468, 477-78 (Bankr. D. Mont. 2003); *Mataya v. Kissinger (In re Kissinger)*, 72 F.3d 107, 108-109 (9th Cir. 1995).

First, counsel for YCLT stated at the hearing that YCLT did not oppose CIP's motion as it relates to the Gardess Road homes. Given the lack of opposition by YCLT and after consideration of the objections raised by other parties, the Court concluded at the hearing that the motion would be granted as to the Gardess Road homes.

As for the Porcupine Creek property, the instant case presents the valuation opinions of two appraisers, Smith and Dozier. As between Smith's and Dozier's appraisals, the Court first notes that Dozier's appraisal contains much more detail than Smith's and is more objective than Smith's appraisal, which appears to be based almost solely on Smith's unsubstantiated opinion that was derived from a non-expert third party, namely the greenskeeper at Porcupine Creek. Moreover, after listening to Smith and Dozier testify, the Court concludes that Dozier has a better grasp of the current market conditions in the Coachella Valley, and in particular, Rancho Mirage. Thus, this Court gives greater weight to Dozier's testimony and appraisal.

The parties agree that BLX is in default on its obligation to CIP. In addition, it is clear from the record that BLX is not in a position to offer adequate protection payments to CIP. Thus, under § 362(d)(1), the sole issue is whether CIP is adequately protected. Based upon Dozier's persuasive testimony and appraisal, the Court finds that the "as is" impaired value of Porcupine Creek is currently $73,500,000. Byrne testified that CIP was owed approximately $43 million as

of BLX's involuntary petition date. The foregoing numbers leave CIP with a $30,500,000 equity cushion. The foregoing equity cushion is even greater if one considers that CIP also has a security interest in the Blixseth Family compound, which Byrne was going to purchase from Blixseth for $56 million just one or two years ago, and which the parties seem to agree is worth at least $6 to $8 million at the present time. The substantial equity cushion adequately protects CIP and thus, its request for relief under § 362(d)(1) is denied.

In the alternative, CIP seeks relief from the automatic stay under § 362(d)(2), which permits a creditor to seek relief from the automatic stay when a debtor lacks equity in property that is not necessary to an effective reorganization. CIP has a first position lien against Porcupine Creek in the amount of approximately $43 million. CIP asserts that Porcupine Creek is encumbered by the junior liens of Jon Peddie and Stephan Baden ($650,000), Palm Desert National Bank ($3,775,000), West Coast Turf ($4,041.29), First Bank ($10,000,000), United Rentals Northwest ($19,041.04), Jorge V. Jasson ($3,465,056.78), Sacia Enterprises, Inc .($3,465,056.78), Greg LeMond ($3,465,056.78), and David L. and Sacia B. Morris ($3,465,056.78), for a total of $28,308,309.45. The aforementioned amount combined with the amount owed to CIP equals $71,308,309.45, which leaves BLX with just over $2 million equity in Porcupine Creek.

Subsection 362(d)(2) applies only when a debtor does not have equity in the collateral at issue and the property is not necessary for an effective reorganization. In this case, the evidence shows that BLX has a small amount of equity in the property. Moreover, YCLT has shown that BLX needs Porcupine Creek in order to effectively reorganize, because without Porcupine Creek, BLX essentially has nothing. However, if BLX can retain Porcupine Creek and sell it for its fair

22

market value, numerous parties will benefit.  On the other hand, if CIP is granted relief from the automatic stay, it is doubtful that anyone, other than CIP, will receive anything from BLX's bankruptcy estate.  Accordingly, CIP's request to modify the stay under § 362(d)(2) must be denied at this time.

### 2.  YCLT's Motion for Appointment of Trustee.

On September 22, 2009, YCLT filed an Emergency Motion for Appointment of Trustee, requesting that the Court enter an Order directing the United States Trustee to appoint a trustee under 11 U.S.C. § 1104(a) to protect the assets of BLX.  Section 1104(a)(2) provides:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee–
>
> * * *
>
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor[.]

Appointment of a trustee in this case is justified under § 1104(a)(2) of the Bankruptcy Code because it is in the best interests of creditors and other stakeholders for an independent trustee to manage and protect Porcupine Creek until it can be sold under a professionally managed sales process.  In addition, the evidence shows that Porcupine Creek requires expenditures for maintenance and security.  To that end, the  golf course and other amenities at Porcupine Creek should be managed and maintained by appropriate professionals.

YCLT has arranged for post-petition financing to be proposed to the chapter 11 trustee, if appointed by the Court, in an amount sufficient to cover necessary expenses for up to one year.

23

This Court agrees with YCLT that an experienced Chapter 11 trustee, with appropriate financing, will be able to manage Porcupine Creek to benefit all legitimate creditors rather than permit the property to be given at a bargain "fire sale" price to a first mortgagee.

Furthermore, the Court concludes that it is in the best interests of all creditors to eliminate the insider circumstances and conflicts of interest created as a result of Edra's interest in Porcupine Creek.  First, although Edra is the director and president of BLX and thus owes a fiduciary duty to all creditors, Edra personally retains any residual equity interest in BLX after all creditors are paid.  Second, Edra currently resides at Porcupine Creek and controls any spending related thereto. If BLX obtained debtor-in-possession financing, Edra could arguably control such financing.  Given Edra's past management of the Yellowstone Club entities, BLX and Porcupine Creek, putting Edra in charge of any debtor-in-possession financing at thus juncture would be ill-advised.  Short of conversion to Chapter 7, the appointment of a Chapter 11 trustee in this proceeding is the only solution that would permit BLX to go through with a viable Chapter 11 bankruptcy.  Therefore, YCLT's request for the appointment of a trustee is granted.

**3.  YCLT's Motion for Leave to File Adversary Proceeding**.

Finally, YCLT seeks leave to file its fraudulent conveyance action against CIP.  This Court has the authority to authorize a creditor, such as YCLT, to commence a fraudulent transfer action to void CIP's lien.  *See Hansen v. Finn (In re Curry and Sorenson, Inc.)*, 57 B.R. 824, 827-28 (9th Cir. BAP 1986) (holding that an individual creditor may pursue an avoidance action for the benefit of the bankruptcy estate with court approval).  "If a creditor is dissatisfied with lack of action on the part of the debtor-in-possession, the creditor may . . . petition the court . . . to gain court permission to institute the action itself."  *Id*. at 828.  *See also In re Spaulding*

*Composites Co., Inc.,* 207 B.R. 899, 903 (9th Cir. BAP 1997); *In re Valley Park, Inc.*, 217 B.R. 864, 866-67 (Bankr. D. Mont. 1998) ("It is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or the debtor-in-possession to pursue the estate's litigation.").

In the case *sub judice*, control of BLX is somewhat in a state of flux because Samson does not appear to have the financial wherewithal to pursue any action on behalf of BLX, particularly where Samson consented to allowing Western Capital Partners to pursue its non-bankruptcy remedies with respect to Edra's stock in BLX. In addition, counsel for YCLT agrees to turnover litigation of any fraudulent conveyance action to the Chapter 11 trustee immediately upon appointment. Given the state of this Debtor, the Court sees no reasons to delay the fraudulent conveyance action. Accordingly, YCLT's request for permission to immediately file a fraudulent conveyance action against CIP is granted.

In accordance with the foregoing, the Court will enter a separate order providing as follows:

IT IS ORDERED that YCLT's Emergency Motion for Rule 2004 Examinations filed September 29, 2009, is DENIED on grounds that the passage of time has rendered the Motion moot.

IT IS FURTHER ORDERED CIP's Emergency Motion to Modify Automatic Stay, pursuant to 11 U.S.C. §§ 362(d)(1) and (2), Fed. R. Bankr. P. 4001 and 9014, and Mont. LBR 4001-1 to Foreclose on Collateral filed September 25, 2009, at docket entry no. 16, is DENIED, in part, and GRANTED, in part; and the stay afforded by § 362(a) of the Bankruptcy Code is modified to permit CIP to pursue its non bankruptcy remedies against the following property of

25

the estate:

> Two single family houses (and associated personal property) situated
> in the State of California, County of Riverside, City of Rancho
> Mirage, and described as follows:
> **Parcel 1**: (684-313-010)
> Lot 49 of Tract 2530, as shown by map on filed in Book 47 Page(s)
> 48, of Maps, Records of Riverside County, California.
> **Parcel 2**: (684-373-007)
> Lot 64 of Tract 2530, as shown by map on filed in Book 47 Page(s)
> 48, 49 and 50, of Maps, Records of Riverside County, California,
>
> both more commonly known as 71361 Gardess Road and 71621
> Gardess Road, Rancho Mirage, California.

IT IS FURTHER ORDERED that the Emergency Motion for Appointment of Trustee

filed September 22, 2009, at docket entry no. 6, is GRANTED; and the U. S. Trustee shall

immediately appoint a Chapter 11 trustee to manage and protect all the Debtor's property,

including the property known as "Porcupine Creek" in Riverside County, California.

IT IS FURTHER ORDERED that the Emergency Motion of Yellowstone Club

Liquidating Trust for Leave to File Adversary Proceeding filed October 5, 2009, at docket entry

no. 94, is GRANTED; and YCLT may immediately file its fraudulent conveyance action against

CIP.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

26